**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TIMOTHY & THOMAS LLC,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **06 C 1813** |
| | ) | |
| **VIRAL GENETICS, INC. and HAIG** | ) | |
| **KELEDJIAN,** | ) | |
| **Defendants.**[1] | ) | |
| _____ | ) | |
| **VIRAL GENETICS, INC.,** | ) | |
| **Counterclaim Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TIMOTHY & THOMAS LLC,** | ) | |
| **Counterclaim Defendant.** | ) | |

## MEMORANDUM AND ORDER

Plaintiff Timothy and Thomas LLC ("T&T") sued Viral Genetics, Inc. ("VGI") and Haig

Keledjian (VGI's CEO) asserting breach of contract and fraud claims arising out of agreements

between the parties regarding the development and commercialization of thymus nuclear protein

as a treatment for HIV/AIDS. In response, VGI filed eleven counterclaims against T&T and its

members Timothy Wright and Thomas Little (collectively the "T&T Parties") alleging fraud,

conspiracy to commit fraud, multiple breaches of contract, breach of the implied covenant of

good faith and fair dealing, breach of fiduciary duty, aiding and abetting breach of fiduciary

duty, tortious interference with contract, tortious interference with prospective economic

advantage, trade libel, and unfair business practices. The T&T Parties' motion for summary

---

[1] The clerk is directed to correct the docket to reflect that Viral Genetics and Haig Keledjian are
the only defendants in the main case, and T&T is the sole counter-defendant.

judgment on all of VGI's counterclaims is before the court. For the following reasons, their motion is denied in part and granted in part.

## I.     Background

### A.     Local Rule 56

Local Rule 56.1 requires a party seeking summary judgment to submit a statement of material facts as to which the party contends there is no genuine issue and which entitle it to judgment as a matter of law. The rule also allows a responding party to submit a statement of additional facts that require the denial of summary judgment. The statements of fact must be concise and consist of "short numbered paragraphs." Without leave of court, the moving party's statement of fact cannot exceed 80 paragraphs, while the responding party is limited to 40 paragraphs. Both parties' submissions fail to comply with the rules governing summary judgment motions.

VGI submitted a statement of additional facts containing paragraphs that often addressed multiple unrelated facts and stretched on for nearly two pages each. *See, e.g.*,VGI's Additional Facts (Doc. 190) VGI Resp. to T&T Facts and VGI Additional Facts [docket #186] at ¶ 18. Its effort is neither concise nor short. The kitchen sink approach also subverts Local Rule 56.1's goal of providing a structure that allows for efficient resolution of summary judgment motions. *See Markham v. White*, 172 F.3d 486, 489 (7th Cir. 1999) ("the kind of organization the rules require must occur sooner or later, and the system as a whole is better served if it happens sooner").

With respect to the T&T Parties, they did not consistently attach the cited evidence supporting their denials of VGI's statements of fact as an exhibit to their response. Rule 56(e)(1) requires them to do so, and the failure to attach cited evidence makes it inadmissible for

purposes of the summary judgment motion.  *See Comm 2000, LLC v. Southwestern Bell Mobile Systems, LLC*, No. 05 C 457, 2009 WL 1851130, at *5 (N.D. Ill. Jun. 29, 2009).

In addition, the T&T Parties accuse VGI of deluging the court with irrelevant facts and responses, but nevertheless submitted 137 objections to VGI's statement of additional facts, the vast majority of which were unfounded.  *See* T&T Response to VGI's Additional Facts [dkt. #190].  For instance, VGI's additional fact three states in its entirety: "VGI needed funding and had no choice but to sell T&T its distribution rights in Africa."  Despite VGI's commendable brevity, the T&T Parties contend that this fact is not short and concise.

Nevertheless, in the interests of expeditiously resolving the pending motion for summary judgment in this 2006 case, the court will not require the parties to redo their filings.  It thus turns to the parties' objections to the opposing side's statements of fact.  In doing so, it acknowledges that its discussion of specific objections prior to a summary of the facts is likely confusing to the reader.  However, due to the generally chaotic state of the record, the court will forge on.

**B.    Objections**

**1.    VGI**

The T&T Parties' ¶ 12 states that the FDA rejected VGI's pre-IND meeting information package and cites to the testimony of Monica Ord, who was a consultant hired by VGI to raise funds for VGI.[2]   T&T Facts in Supp. of SJ [dkt. #18],  Ex. 11 at 108:8-22.  VGI contends that

---

[2]  "IND" is an acronym standing for "for investigational new drug."  The pre-IND package contains information about proposed new drugs.  *See* Guidance for Industry: IND Information for Human Drugs and Biologics (2001), available at http://www.fda.gov/downloads/Drugs/ GuidanceComplianceRegulatoryInformation/Guidances/ucm070568.pdf (last visited July 26, 2010).  Further submissions with unexplained acronyms or medical terms will be stricken, as this practice makes the parties' submissions unnecessarily confusing.

this paragraph misrepresents the cited testimony and that Ord lacks personal knowledge. *See* Fed. R. Evid. 602. In the cited testimony, Ord refers to the FDA's rejection of the IND, but does not specify whether she is referring to the pre-IND. Moreover, Ord's position at VGI required her to recruit investors, board members and scientists, so VGI has not provided the necessary foundation for Ord's testimony about the FDA approval process. *See* VGI Opp. to T&T MSJ [dkt. #185], Ex. 37 at 37:3-6. Accordingly, the T&T Parties' ¶ 12 is stricken.

Second, VGI objects to the portion of the T&T Parties' ¶ 25, which provides that, "Ord has no evidence that the T&T Parties did anything to create the recruitment problems affecting the trial and Ord admits the trial was not delayed or destroyed as a result of Wright's handling of the amendment to the endpoint."[3] *See* T&T Facts in Supp. of SJ [dkt. #184]. According to VGI, this portion of ¶ 25 misrepresents Ord's testimony, is not supported by personal knowledge, and is inadmissible hearsay.

When asked if Wright exacerbated the recruitment problems, Ord responded, "[c]ould be. I don't know. From what I know, yes, could be." VGI Opp. to T&T MSJ [dkt. #185], Ex. 37 at 90:6-9. The statement "Ord has no evidence" is literally true, as based on the current record, Ord stated that she did not know who was responsible for the recruitment problems and at best speculated that Wright caused them. The court will not consider Ord's speculation.

The second part of T&T's ¶ 25 states that Ord admits the trial was not delayed by Wright's handling of the amendment to the endpoint. This is also a fair characterization of Ord's testimony. *See* T&T Facts in Supp. of SJ [dkt. #184], Ex. 11 at 211:22-212:4. Nevertheless, as

---

[3] "Recruitment" refers to the process of locating patients who are willing to participate in drug tests in connection with clinical trials. An "endpoint" is the "[o]verall outcome that the protocol is designed to evaluate." *See* United States National Institutes of Health Glossary of Clinical Trials Terms, http://clinicaltrials.gov/ct2/info/glossary (last visited July 26, 2010).

noted by VGI, Ord lacks authority to make a binding admission given the scope of her employment as a consultant for VGI. Therefore, Ord's testimony on this issue reflects her opinion and is not an admission by VGI.

### 2. The T&T Parties

The T&T Parties raise the following objections to VGI's statement of additional facts.

*Objection No. 1 – ¶¶ 1-40 are not short and concise as required by Local Rule 56.1*

The court agrees that portions of VGI's statement of additional facts are neither short nor concise. However, as discussed above, given the age of this case and in the interests of economy, the court will not require the parties to redo their briefs. Thus, this objection is overruled.

*Objection No. 2 –¶¶ 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 26, 27, 28, 30, 31, 32, 34, 36 & 37 contain facts that are irrelevant*

The T&T Parties do not attempt to parse out the allegedly irrelevant facts and the court declines to speculate as to what their arguments might have been. In any event, objections to facts based on relevancy are improper. *Keefe v. Mega Enterprises, Inc.*, No. 02 CV 5156, 2005 WL 693795, at *1 (N.D. Ill Mar. 23, 2005). Thus, this objection is overruled.

*Objection No. 3 – The evidence cited in ¶¶ 2, 4, 5, 6, 7, 8, 10, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39 & 40 does not support the fact asserted.*

The T&T Parties again failed to specifically identify the allegedly inaccurate portions of the specified paragraphs. Nevertheless, the court has carefully reviewed the parties' Rule 56.1 statements and the corresponding portions of the record. To the extent that any fact is not supported by the evidence cited in support, it will be disregarded.

*Objection No. 4 – ¶¶ 4, 10, 21, 28, 30, 34 & 39 contains hearsay or lack foundation*

Yet again, the T&T Parties' general objection forces the court to speculate as to which portions of the record are, in their view, improper. To ensure that its ruling is based on admissible evidence and determine if genuine issues of material fact warrant a trial, the court will nevertheless comment on evidentiary issues to the extent that it can do so based on the parties' briefs. To the extent that the court has not correctly determined the basis for the T&T Parties' objections (for all of its objections, not just this particular group), any further objections raised in a motion to reconsider will be deemed waived.

The objection to ¶¶ 10 and 30 appears to take issue with Exhibit 27, a summary of damages memorandum prepared by Michael Capizzano (VGI's former Vice President of Finance, Business and Corporate Development). Because this document is not the sole basis for the facts in these paragraphs, the objection is overruled.

With respect to ¶ 21, the T&T Parties appear to be arguing that Exhibit 3, VGI's Form 10-KSB, is hearsay. *See* T&T Facts in Supp. of SJ [dkt. #184]*, Ex. 3.* This form is regularly made in the course of a publicly traded company's business and thus falls within the "records of regularly conducted activities" hearsay exception. *See* Fed. R. Evid. 803(6). It is also subject to judicial notice. *See, e.g., Benhabib v. Hughes Electronics Corp.*, No. CV-04-0095, 2007 WL 4144940 (C.D. Cal. 2007). This objection is, therefore, overruled.

Paragraph 28 is based on Keldejian's testimony that HPC Capital told him it would not loan another $2 million because the stock price dropped. *See* VGI Opp. to T&T's MSJ [dkt. #185], Ex. 1 at ¶ 57; T&T Facts in Supp. of SJ [dkt. #184], Ex. 5 at 645. HPC Capital's statement of why it chose not to loan additional money to VGI is an out of court statement made

by someone other than the declarant (Keledjian) offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c) Therefore, this portion of ¶ 28 is hearsay and hence inadmissible.

Similarly, in VGI's ¶ 30, it states that according to Keledjian, "[it] had several prominent members in the pharmaceutical research industry on its Scientific Advisory Board and had obtained commitments from each of them, and others to be introduced to major drug companies for strategic partnership opportunities . . . ." *See* VGI Opp. to T&T MSJ [dkt. #185], Ex. 1 (Keledjian Aff.) at ¶ 65; VGI Opp. to T&T MSJ [dkt. #185], Ex. 32 at 666: 5-22. Keledjian may not testify about what members of the Scientific Advisory Board told him given that VGI is offering those statements for the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Therefore, this objection is sustained and the portion of ¶ 30 addressing commitments to introduce VGI to drug companies is stricken.

The T&T Parties next challenge VGI's ¶ 34, which reflects Keledjian's personal opinion regarding what would have happened at VGI in the absence of the T&T Parties' alleged wrongful conduct. While speculative, this fact is supported by Keledjian's own testimony and hence is not hearsay. *See* Fed. R. Evid. 801(b)-(c).

With respect to ¶ 38, the T&T Parties provide a specific objection and contend that the portion of this paragraph asserting that IDG backed out of a $4 million distribution deal with VGI because of the T&T Parties' conduct is based on hearsay. Their objection then falters as they provide an *id.* cite in support of their objection. This is unhelpful as the previous citation contains five citations, most of which appear to be unrelated to the contention at issue. The only reasonable option is Keledjian's statement that "[IDG] signed a term the term sheet. They did their due diligence, and they came back and talked about some of our reputation problems . . ." VGI Opp. to T&T MSJ [dkt. #185], Ex. 32 at 676:12-677:8. Keledjian's recitation of IDG's

purported statements as to why it abandoned the deal is offered for the truth of the matter asserted and thus is inadmissible hearsay. *See* Fed. R. Evid. 801(c).

Finally, the T&T Parties take issue with VGI's ¶ 39, which states that the T&T Parties directly communicated with potential VGI investors and convinced them not to invest. This is based on VGI officers Keledjian and Capizzano's recitation about what investors told them and hence is inadmissible hearsay. *See* Fed. R. Evid. 801(c).

*Objection No. 5 – ¶¶ 4, 5, 12, 13, 14, 13, 15, 18, 20, 22, 27, 36, 37, 38 are supported by evidence that is not certified or otherwise authenticated.*

The T&T Parties' fifth objection states in its entirety: "The T&T Parties object to VGI's Statement of Additional Facts in whole and in part to the extent the Additional Facts are based on purported evidence that is not certified or otherwise authenticated." Each of the listed paragraphs cite to multiple sources of evidence. This sweeping objection does not provide even a glimmer as to its basis and hence is overruled.

The court also notes that many of the paragraphs within the ambit of this objection are deposition transcripts that include a certification by a court reporter. A party does not act in good faith if it objects to a document it knows is authentic. *See Fenje v. Feld*, 301 F. Supp. 2d, 781, 789 (N.D. Ill. 2003) (noting that such an objection is merely obstructive). There is no discernable basis for a challenge to the authenticity of deposition transcripts, so these objections are not well taken. Moreover, this kind of objection is particularly ill-advised given the general state of the record. The T&T Parties' attorneys proceed at their own risk if they continue in this vein.

*Objection No. 6 – ¶¶ 4, 10, 24, 25, 26, 27, 33, 35 contain improper lay opinion*

Yet again, the T&T Parties' blanket objection fails to identify what evidence is allegedly improper lay opinion. To the extent that the cited paragraphs cite to Keledjian and Capizzano's testimony, the objection is overruled as their opinions are based on their personal knowledge. *See* Fed . R. Evid. 701. To the extent that any other portions of these paragraphs allegedly are based on improper lay testimony, the objection is overruled as the court declines to look at all of the testimony in the cited paragraphs, locate opinions in that testimony, construct arguments as to the propriety of the opinions, and then rule on its own objections.

*Objection No. 7 – ¶¶ 10, 22, 24, 25, 26, 27, 29, 35, 39 and the evidence supporting them were not disclosed in the course of discovery*

In their final group of objections, the T&T Parties contend that certain paragraphs about damages must be stricken because VGI failed to supplement its disclosures. See Fed. R. Civ. P. 26(a)(1)(A)(iii). The court cannot ascertain what evidence allegedly flows from a discovery violation so the T&T Parties have waived this argument.

With these procedural ground rules in place, the court turns to the substance of the parties' Local Rule 56.1 submissions.

### C. Facts

#### 1. The Parties

Plaintiff/counterclaim defendant T&T is an Illinois limited liability company with its principal place of business in Chicago, Illinois. T&T's members are Timothy W. Wright III and Thomas Little, both of whom are Illinois citizens. Defendant/counterclaim plaintiff VGI is a publicly owned drug development company organized under Delaware law with its principal place of business in California. Defendant/counterclaim plaintiff Haig Keledjian is VGI's

president, CEO, and CFO and is a California citizen.  Michael Capizzano served as VGI's Vice President of Finance, Business and Corporate Development for approximately six years and continues to act as a consultant.

### 2.  Initial Relationship Between the Parties

VGI was founded in 1995 and is engaged in the research and development of immune based therapies for HIV/AIDS.  VGI pursued the development of an HIV/AIDS therapy based on drug compounds containing thymus nuclear protein ("TNP").  The particular drug compound at issue in this case was VGV-1.  VGI stopped development of drugs based on TNP in mid-2006.

Dr. Harry Zhabilov, Sr. performed some of the earliest research into TNP-based treatments for HIV/AIDS.  Zhabilov Sr. was VGI'S founder and its chief scientific officer. Zhabilov Sr. developed a secret, proprietary process for the extraction of TNP from thymus tissue.  After Zhabilov Sr. died in 2003, his son, Harry Zhabilov, Jr., was the only person who knew how the process worked.  In 2003, VGI employed Zhabilov Jr. to continue his father's work.

In early 2003, Richard Dent, former football player for the National Football League's Chicago Bears, introduced an unidentified person at VGI to attorney Timothy Wright.  On April 3, 2003, VGI and Wright entered into a consulting engagement agreement under which Wright agreed to, among other things, advise VGI regarding potential financing alternatives and assist VGI to develop strategic partnerships.  The consulting agreement contained a choice-of-law provision which stated, "[t]his agreement shall be governed by the law of the State of California without regard to choice-of-law provisions."  VGI Opp. to T&T MSJ [dkt. #185], Ex. 2 at 2-8, ¶ 7.01.

During a trip to Africa in June of 2003 to promote VGI's product, Wright introduced unspecified VGI officers to Thomas Little, a principal of a large American demolition company who appears to have been vacationing in Africa at the time. In October of 2003, Little agreed to loan $200,000 to VGI in the form of a convertible debenture, which is a debt instrument that can be converted into stock at the option of the holder or the issuer.

### 3. African Trial Approved

In February of 2004, the Medicine Control Council of South Africa gave VGI approval to conduct a Phase III human clinical trial using VGV-1, which is an injectable form of TNP. The trial was designated TNP-001. VGI hired Dr. Ronald Moss to head VGI's scientific advisory board ("SAB") and provide advice for the clinical trial. VGI contends that at this time, it began to realize that its previous principal financier (a private citizen whose son had AIDS) would not be able to fund the trial. T&T Facts in Supp. of SJ [dkt. #184], Ex. 2 at ¶ 124.

### 4. T&T Negotiations

On April 11, 2004, Wright told Keledjian that he intended to form a partnership with Little for the purpose of acquiring the distribution rights to VGV-1 in Africa from VGI. At approximately the same time, Little asked VGI to repay his $200,000 loan. According to VGI, it had no choice but to agree to the give up the distribution rights because it did not have funds to repay the loan. The T&T Parties dispute this assertion.

#### a. Africa Agreement

On May 7, 2004, T&T and VGI signed an agreement memorializing their discussions regarding the sale of the distribution rights for VGV-1 in Africa (the "Africa Agreement"). At an unspecified point, Viral Genetics South Africa ("VGSA") came into being. In exchange for the distribution rights, T&T agreed to fund up to $2,000,000 of VGSA's activities in Africa and

-11-

to devote a portion of the $2,000,000 to "assure completion of the Clinical Trials provided the total cost of Clinical Trials shall not exceed $1,200,000." The parties dispute whether the reference to "Clinical Trials" in the Africa Agreement was limited to TNP-001.

The Africa Agreement also allowed VGI to elect to receive money from T&T in exchange for an assignment of VGI's ownership rights in VGSA to T&T. T&T Facts in Supp. of SJ [dkt. #184], Ex. 7 at 2. It further provided:

> Upon VGI's election to receive payment from [T&T] under this Agreement in the amount of $520,000, assign 90 percent of its ownership rights in VGSA to [T&T] and extend to [T&T] a perpetual right to purchase at any ownership rights [sic] to VGSA retained by VGI and later offered by VGI to any third party at terms and conditions offered to such third party.

*Id*.

### b. The Distribution Management Agreement

In December of 2004, VGI and T&T entered into the Distribution Management Agreement ("DMA"). T&T Facts in Supp. of SJ [dkt. #184], Ex. 8. The DMA superseded the Africa Agreement, but does not mention VGSA. T&T paid VGI $650,000 under the DMA.

The DMA defines "Clinical Trial" as:

> The multi-center, randomized, double blind, placebo-controlled human clinical trial of a product named VGV-1 as approved by letter dated February 27, 2004, from the Medicines Control Council of South Africa to be performed in accordance with an agreement between Viral Genetics, Inc. and Virtus Clinical Development (Pty) Ltd. Dated August 1, 2003 including any amendments thereto.

T&T Facts in Supp. of SJ [dkt. #184], Ex. 8. at 2. The DMA also contains a choice-of-law provision which states it "shall be construed and interpreted under the laws of the State of California, without regard to conflicts of law principles." T&T Facts in Supp. of SJ [dkt. #184], Ex. 8. at 17.

Like the Africa Agreement, the DMA contained a provision requiring T&T to pay for

portions of the Clinical Trial.  Specifically, ¶ 15 of the DMA states:

A)      T&T shall pay $1,600,000 [USD] to complete the Clinical Trial.  T&T
shall pay any additional costs in excess of $1,600,00 [USD] incurred to complete
the Clinical Trial.  VGI shall reimburse T&T in an amount equal to one half of
any such additional costs in excess of $1,600,000 [USD] incurred to complete the
Clinical Trial.  Said reimbursements shall be tendered by VGI to T&T on a
monthly basis on or before the 10th day of each calendar month in which said
costs are paid to T&T.

B)      T&T will cooperate and provide all assistance, and will cause each
Distributor to cooperate and provide all assistance, reasonably requested by VGI
in the design and implementation of any and all test, protocols, studies or trials of
the Product in the Territory.

*     *     *

D)      In the event T&T concludes that it will be expedient or necessary, for the
purpose of selling and distributing the Product in a significant part of the Territory, to retain the
services of any third party to conduct part of or all of any future clinical trial services, the Parties
hereto agree to share the cost of such third party services equally.

Again, as under the Africa Agreement, the parties dispute whether T&T's obligations

were limited to TNP-001.  According to T&T, it was only responsible for funding TNP-001 and

any other activities were the sole responsibility of VGI unless they were approved by Wright in

his capacity as president of VGSA.  In contrast, VGI asserts that the language in ¶ 15(B)

requiring T&T to provide assistance meant that T&T was required to fund more than just TNP-

001.  VGI also stresses that Keledjian testified that he believed Wright had approved funding of

another trial for TNP-002.  *See* VGI Resp. to T&T Facts and VGI Additional Facts [dkt. #186] at

¶ 9; T&T Facts in Supp. of SJ [dkt. #184], Ex. 5 at  757:11-758:22.

The DMA also required VGI to manufacture VGV-1 itself.  *See* T&T Facts in Supp. of

SJ [dkt. #184], Ex. 8 at 6 ("VGI agrees to allocate and make available for delivery to all

Distributors an absolute minimum delivery of fifty thousand (50,000) Treatment Units in each

calendar month").  To comply with its manufacturing obligations, VGI commissioned the construction of a manufacturing facility in June of 2004.

Keledjian testified he did not want VGI to be in the manufacturing business.  Thus, VGI's plan was to build a facility to satisfy the contract, but then convert it "into a full blown research laboratory or to produce trial grade TNP."  T&T Facts in Supp. of SJ [dkt. #184], at ¶ 35; T&T Facts in Supp. of SJ [dkt. #184], Ex. 8 at 518:16-519:14].

### 5.      The Clinical Trial

The clinical trial in Africa did not proceed smoothly.  First, the entity responsible for recruiting participants (the parties' use of the passive voice makes it impossible to ascertain who was responsible, but the parties generally appear to be casting blame for the recruitment issues on each other) experienced problems getting people to sign up to participate in the trial.  Monica Ord, a consultant hired by VGI, opined that Wright did not exacerbate the recruitment problems.

Second, some of the patients' baseline data was missing.  As with the recruitment situation, the parties dispute who was responsible as well as whether it was necessary to have all the baseline data.  According to Keledjian, VGI needed accurate baseline data to compare the before and after effect of VGV-1 on certain immunological markers.  On the other hand, the T&T Parties cite to the testimony of Dr. Moss (the head of VGI's scientific advisory board) that baseline data is not necessary for studies involving substances like TNP-001.

The parties also dispute when they learned that baseline data was missing.  VGI asserts that the T&T Parties knew about the missing baseline data in June 2005, while the T&T Parties contend that VGI found out about the missing data in February of 2005.

Third, the parties disagree about the trial's proper endpoint and its effect on the release of the clinical trial results.  Dr. Moss recommended changing the study's endpoint to a lower

endpoint (a term which the parties do not define) at least as early as May of 2005. According to VGI, Wright agreed to this change in May of 2005 but unbeknownst to VGI, failed to make the change. The T&T Parties disagree, asserting that Wright agreed to change the endpoint only if Dr. Moss provided a rationale for doing so, and that he never did so.

On December 14, 2005, VGI issued a press release stating it anticipated it would disclose clinical trial results by March 31, 2006. VGI, however, released the clinical trial results in the Summer of 2006. The parties dispute whether the delay was caused by Wright's failure to amend the endpoint.

Finally, the clinical trial results were at best only moderately favorable. Dr. Moss testified that the results failed to meet even the amended endpoint and that the activity of the drug was weak compared to other HIV therapies. On a more positive note, however, Dr. Moss opined that VGI was on the right track regarding the execution of the trial, even if the results were not ideal.

### 6.    The Alleged Bankruptcy Plot

VGI claims that the T&T Parties intended to force it into bankruptcy so they could acquire VGI's assets at a bargain price. VGI does not specify when the T&T Parties hatched this alleged plot, but the earliest materials it cites in support date from January of 2006. The T&T Parties deny that they formulated a plan to drive VGI into bankruptcy.

VGI also appears to be contending that as part of the alleged plot, the T&T Parties and Zhabilov, Jr. had discussions in 2005 about Zhabilov, Jr. working for T&T after his contract with VGI expired. According to VGI, following these discussions, Zhabilov, Jr. stopped performing his duties at VGI and thus failed to identify the mechanism of action for VGV-1, refused to

provide information necessary for registration in Africa, and provided the T&T Parties with a list of VGI's creditors to assist the T&T Parties' purported plan to push VGI into bankruptcy.

### 7. The Alleged Bankruptcy Push

In March of 2006, the T&T Parties demanded that VGI repay $500,992.93 and threatened legal action if VGI failed to do so. VGI paid the full amount. The parties disagree as to whether this amount exceeded the amount of VGI's debt to the T&T Parties. The T&T Parties were aware that demanding repayment could be financially harmful to VGI, as if VGI did not pay, it might be forced into bankruptcy and if it did pay, the T&T Parties could still file suit.

### 8. Aftermath

To pay off the $500,992.93, VGI obtained $3 million in so-called death spiral financing from HPC Capital, with the potential for an additional $2 million.[4] HRC Capital received shares of VGI's stock each month to repay the loan. The number of the shares was based on the prior month's stock price, so if the stock value declined, HRC Capital received a higher number of shares. According to VGI, its stock declined in value during 2006 and 2007, but it paid off the loan by August of 2009.

In addition, at some point in the second half of 2006, VGI entered into a joint venture with the University of Colorado. Under the joint venture, the University obtained an interest in VGI and the University and its scientists agreed to study VGI's HIV/AIDS drugs. At about this

---

[4] There are a variety of ways to obtain death spiral financing, but all are characterized by the significant risks they pose to cash strapped companies. One common method allows the company to raise money by issuing securities where the number of shares issued increase as the share price falls, which causes shareholders to greatly dilute their equity and potentially lose control of the company.

time, VGI also decided to stop attempting to develop drug products derived from TNP.

Approximately two months later, VGI decided to terminate Zhabilov Jr.

### 9. VGI's Claimed Damages

#### a. General Assertions

During discovery in this suit (which was extended several times), the T&T Parties

submitted the following interrogatory to VGI seeking information about its counterclaims:

"Describe in detail the damages You purportedly suffered as the result of the alleged conduct set

forth in the Amended Counterclaim and provide a precise calculation of those damages." In

response, VGI stated that:

> among other things, as a result of Counterclaim Defendants' conduct, it: (1) lost significant investment capital; (2) saw its stock price drop significantly; (3) built and financed the construction of a manufacturing facility it did not need; (4) expended at least $607,329.36 unnecessarily as a result of T&T's mismanagement of the Phase III Clinical Trial of VGV-2 in South Africa and breach of the Distribution Management Agreement . . . [footnote: VGI reserves its right to seek additional damages resulting from T&T's mismanagement of the Phase III Clinical Trial of VGV-1 in South Africa and breach of the Distribution Management Agreement]; (5) was forced to halt certain research and development that has caused, among other things, a substantial delay in approval for VGV-1; (6) is forced to recreate the data that Wright and VGSA failed to collect in connection with the PBMC test and the other immunological markers tests; (7) suffered the misappropriation of its confidential and proprietary business information; (8) suffered damage to its reputation and credibility; (9) was forced to accept "death spiral" financing arranged by HPC Capital; and (10) has been forced to divert resources from its day-to-day business to litigation costs and litigation-related activities.

Dkt. 184-17 at 3-4 & n.2.

VGI also asserted that it incurred "at least $3,500,000 in actual damages, in addition to

costs, reasonable attorney's fees, and punitive damages to be determined by a jury at trial."

Other evidence about VGI's alleged damages includes a document prepared by Michael

Capizzano (VGI's Vice President of Finance, Business and Corporate Development at the time)

-17-

summarizing his opinion regarding damages incurred by VGI.  In the memorandum, Capizzano stated VGI's damages were "over $10 million – and I could make out a case for several hundred million."  VGI Opp. to T&T MSJ [dkt. #185], Ex.27 at 27-1.  At his deposition, Capizzano explained that he arrived at the "several hundred million" estimate by totaling the prayers for compensatory and punitive damages in each counterclaim and considering "the damage to our market cap and the opportunity caused [sic] of delaying FDA studies by 18 to 24 months."  VGI Opp. to T&T MSJ [dkt. #185], Ex. 33 at 174:17-180:9.

In addition, Keledjian (VGI's president, CEO and CFO) testified that VGI lost capital, sales, and the chance to engage in joint venture opportunities with other drug companies.  T&T Facts in Supp. of SJ [dkt. #184], Ex. 33 at 664:12-665:11.  Keledjian, however, conceded that VGI did not have any indication from another drug company that they would have been willing to invest money, merge, or support sales if VGI had a registered product.  *Id.* at 666:5-666:22. Instead, the company planned to meet larger companies at the point a drug was registered, who could then decide whether to pursue a relationship with VGI.  *Id.*

Keledjian testified that he is the best person from VGI to answer questions regarding its damages, except that Capizzano could better explain the stock market-related claims.  *Id.* at 639:8.  VGI did not retain an expert to testify about its alleged damages.

### b.    Loss of Investment Capital

VGI claims that it lost investment capital when its stock price declined because: (1) the drop scared additional investors away; and (2) some of its investors exercised their warrants and options.  The only specific lost funding identified by VGI relates to the investor group represented by HPC Capital.  T&T Facts in Supp. of SJ [dkt. #184] at ¶ 20; VGI Opp. to T&T

MSJ [dkt. #185], Ex. 32. However, as discussed in connection with the T&T Parties' fourth objection, *supra*, no non-hearsay evidence supports these claims damages.

Additionally, Monica Ord, VGI's chief fundraiser, testified that she stopped trying to raise money for four or five days in October 2006 based on statements made to her by Wright. T&T Facts in Supp. of SJ [dkt. #184] at ¶ 21; T&T Facts in Supp. of SJ [dkt. #184], Ex. 11 at 255:16-224. Ord did not think she missed out on any funding because of this short delay. T&T Facts in Supp. of SJ [dkt. #184] at ¶ 21; T&T Facts in Supp. of SJ [dkt. #184], Ex. 11 at 255:16-224]. Ord also testified that VGI had difficulties raising capital before it became involved with the T&T Parties. T&T Facts in Supp. of SJ [dkt. #184] at ¶ 22; T&T Facts in Supp. of SJ [dkt. #184], Ex. 11 at 66:1-6.

Dr. Moss, the head of VGI's scientific advisory board, testified that since the 1990s, small biotech companies faced difficulties raising funds. He also opined that a small biotech company's failure to meet its defined endpoint is "somewhat disastrous" because it becomes "very difficult in terms of raising additional funds and confidence by investors." T&T Facts in Supp. of SJ [dkt. #184] at ¶ 23 & Ex. 10 at 27:18-25.

### c.     Drop in Stock Price

VGI asserts that the three-month delay in releasing the results of the TNP-001 trials caused its stock price to drop. According to Ord, Wright's delay in amending the TNP-001 trial's endpoint almost destroyed the trial and thus also harmed VGI's stock price.

### d.     Death Spiral Financing

The parties agree that VGI's decision to accept death spiral financing contributed to the continuing decline of its stock price and dilution of shares. However, VGI did not quantify the harm caused by the death spiral financing. Specifically, Keledjian testified it would be very

difficult to calculate the amount of money lost due to death spiral financing and that VGI had not attempted to make this calculation.

### e. Cost of Building a GMP-Compliant Facility

VGI contends that it is entitled to recover the cost of building a GMP-compliant facility in California.[5]  According to Keledjian, damages associated with construction consist of:  (1) direct construction costs paid by VGI; and (2) indirect costs, such as the cost of labor to work on building and the cost of equipment purchased for the facility.

Keledjian testified that VGI incurred approximately $1 million in direct damages.  VGI also stresses that its March 31, 2006 Form 10-K SEC filing supports this estimate.  The SEC filing represents that VGI made $1,251,697 in equipment and leasehold improvements and paid $149,616/year in rent from 2004 through 2007.[6]

The parties disagree as to how far VGI got with its construction project.  Keledjian asserts that VGI did not finish or completely equip the manufacturing facility because it did not want to be in the manufacturing business as its corporate strategy was to remain a research and development company.  On the other hand, the T&T Parties note that VGI's March, 31 2006 10-K statement represented that the facility was completed in January of 2005 and that once VGI's existing equipment was installed, the facility would be able to support the GMP manufacturing of VGV-1.

---

[5]  "GMP" stands for "good manufacturing practice."  Facilities must meet the GMP standard to be used to produce or run clinical trials for pharmaceutical products.

[6]  The parties agree that VGI is not currently using the manufacturing facility, as it abandoned it due to the University of Colorado research arrangement and turned over the building to the landlord when its lease expired.

With respect to indirect damages caused by construction, VGI contends that it hired employees to work on the facility, who were paid with a combination of salary and stock. The T&T Parties dispute that all of the so-called construction employees worked solely on matters relating to construction.

### f.    The South Africa Trial

VGI next contends that it incurred $607,329.36 in unnecessary costs as a result of the T&T Parties' mismanagement of the South African VGV-1 clinical trials (specifically, the delays purportedly caused by the T&T Parties and alleged budget overruns). VGI also claims that it is entitled to expenses related to the TNP-002 trial. Approximately $571,447.71 of the $607,329.26 VGI claims it is owed by T&T relates to TNP-002.

In its response to the T&T Parties' statement of facts, VGI described its calculations as follows:

> VGI based the amount owing on the T&T Parties' representation that the clinical trial expenses were $2,681,085.86. From that amount, VGI subtracted the amount T&T was obligated to pay under the DMA ($1.6 million) and payments VGI had already made to T&T. Thus, VGI arrived at the $35,881.65 figure. Then VGI added the $571,447.71 for primarily TNP-002 costs to come up with a total of $607,329.36 owed by T&T under the DMA.

VGI Resp. to T&T Facts and VGI Additional Facts [dkt. #186], at ¶ 44; T&T Facts in Supp. of SJ [dkt. #184], Ex. 1; VGI Opp. to T&T MSJ [dkt. #185], Ex. 13-1 to 13-5.

The T&T Parties challenge these calculations, contending that Keledjian testified that VGI cannot produce documentation such as invoices or checks that supports the payments allegedly made under the DMA. They also assert that VGI incorrectly assessed the amount owed by T&T under the DMA. According to T&T, it was only responsible for funding TNP-001

and any other funding was the sole responsibility of VGI unless it was approved by Wright as president of VGSA.

VGI also asserts that the T&T Parties spent money unnecessarily and thus unreasonably increased VGI's fifty percent share of the costs for the TNP-001 and TNP-002 trials. *See* VGI Opp. to T&T MSJ [dkt. #185], Ex. 32 at 589:13-596:23. In support, VGI asserts that the T&T Parties spent $16,000 flying Keledjian to South Africa to prove he had sent a package of Bulgarian human and animal studies to Wright. Keledjian had in fact sent the package, but Wright apparently did not realize it was in his possession. Upon seeing it, he responded, "[w]ell, you know these kind of things happen." *Id*. Once Wright began reading the studies, he furiously called Keledjian (who apparently had returned home), accused him of tampering with the study, and ordered him to return to South Africa immediately.

VGI also appears to be contending that Wright and Little were living the good life at its expense. Keledjian commented that Wright had a very nice house and asked, "[d]o you really need to spend all of this money?" and "[w]hat's wrong with the Hilton, the hotels and stuff like that?" Little responded that T&T needed to "entertain people politically and so on." *See* VGI Opp. to T&T MSJ [dkt. #185], Ex. 32 at 589:13-596:23.

### g.    Delay of Regulatory Approval

VGI contends that the T&T Parties wrongfully forced VGI to stop certain research and development projects which, in turn, caused a substantial delay in obtaining regulatory approval for VGV-1. Keledjian assesses these damages as the value of the 20-30 percent of the company VGI gave to the University of Colorado as part of the joint venture. He testified that this amount depended on VGI's worth, but that at a minimum, VGI lost $20 million.

VGI also asserts that it is entitled to damages for lost opportunities caused by the regulatory delays.  According to Capizzano, T&T and Zhabilov Jr. were engaged in duplicitous conduct that delayed necessary studies about characterization, mechanism of action, and dosing.  Capizzano testified that the cost of this to VGI was "significant and – and difficult to estimate but significant."  T&T Facts in Supp. of MSJ [dkt. #184], Ex. 12 at 179:18-180:4.

### h.  Missing Baseline Data

VGI has three categories of damages relating to the missing baseline data.  First, it claims it paid $500,000 to conduct unnecessary studies.  Second, a default judgment for approximately $210,000 was entered against it and in favor of one of the trial's vendors in South Africa in connection with the missing data.  Third, it paid $500,000 to recreate an approximation of the data it would have received from the baseline studies.

### i.  Misappropriation of Confidential Information

VGI claims that the T&T Parties misappropriated VGI's confidential information.  VGI appears to be contending that due to this alleged misappropriation, it was not required to repay the entire $500,992.93 made by the T&T Parties to VGI (the reader may recall that the demand for repayment of this amount caused VGI to obtain death spiral financing and thus experience significant financial woes).  Keledjian testified that he could not quantify the amount of this category of damages, as the total depended on the outcome of this lawsuit.

### j.  Reputational Damages

VGI claims that the T&T Parties' alleged misconduct damaged its reputation, causing potential investors to refuse to provide funding.  As discussed in § I(B)(2), *supra*, VGI's evidence about reputational damages is hearsay, and it has not cited to any admissible evidence

supporting the fact that potential investors refused to provide funding because of VGI's reputation.

Moreover, Keledjian – VGI's president, CEO and CFO – testified that VGI does not enjoy a good reputation in South Africa, and " all of the reputation that was created was created by Mr. Wright and VGSA and T&T." T&T Facts in Supp. of SJ [dkt. #184], Ex. 5 at 677:4-8. He also testified that VGI had not quantified the amount for this item of damages but it was "still working on it." *Id.* at 677. Capizzano – VGI's Vice President of Finance, Business and Corporate Development at the relevant time – also testified that VGI could not quantify the amount of damages related to a contract with Natale, a potential investor.

### k. Diversion of Funds to Litigation

VGI claims that it was forced to divert resources to litigation and thus had less money to spend on its efforts to work on VGV-1. When asked to quantify this amount, Keledjian estimated VGI had spent $600,000 to $700,000 in legal fees plus the equivalent of fifty percent of his estimated $195,000 annual salary. However, he also testified that VGI had not yet attempted to calculate an exact amount of damages attributable to litigation costs.

### l. Lost Sales & Joint Venture Opportunities

Finally, VGI claims it is entitled to recover damages for lost sales and joint venture opportunities. The parties disagree as to whether VGI's financial condition generally (not just issues relating to the drug trials that are the subject of this lawsuit) was responsible for the lack of sales and joint venture opportunities. Keledjian acknowledged that VGI has never made a profit or had a product registered and approved for commercial distribution. Dr. Moss explained that this was not unusual, given the high risk involved in drug development and the length of time necessary to bring a drug to market.

### D.    The Parties' Claims

As noted above, T&T contends that VGI and Keledjian defrauded it and breached agreements between the parties regarding the development and commercialization of various thymus nuclear protein drugs meant to treat HIV/AIDS.  The T&T Parties have moved for summary judgment on all of VGI's counterclaims, contending that because VGI has not sufficiently established that it suffered damages, all of its counterclaims fail as a matter of law.

## II.    Discussion

### A.    Standard for a Motion for Summary Judgment

Summary judgment is proper when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A genuine issue of material fact exists where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When deciding if summary judgment is proper a court must accept the evidence of the non-moving party and draw all in inferences in favor of that party only when there is a genuine dispute as to those facts.  *Scott v. Harris*, 550 U.S. 372, 382 (2007).  Moreover, when damages are an essential element of a party's claim, summary judgment must be entered against that party if it fails to produce sufficient evidence supporting the existence of damages.  *Dunkin' Donuts Inc. v. N.A.S.T. Inc.*, 428 F. Supp. 2d 761, 767 (N.D. Ill. 2005).

### B.    Choice of Law

In a diversity case, such as this one, the forum state's choice of law rules determine the applicable substantive law.  *See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Unfortunately, the parties gave little thought to this critical threshold issue.  The T&T

Parties merely "assume that California or Illinois law applies, cite the law of both jurisdictions in support of their Motion, and are not aware of any material distinction between the relevant laws of the two jurisdictions." T&T Mem. Supp. to T&T SJ [dkt. #183] at 8, n.4. VGI, on the other hand, asserts that the DMA is governed by California law but does not address the law to be applied to claims that are not based on the DMA. VGI Opp. to T&T MSJ [dkt. #185] at 7, n.4.

The DMA between T&T and VGI provides it "shall be construed and interpreted under the laws of the State of California, without regard to conflicts of law principles." T&T Facts in Supp. of SJ [dkt. #184], Ex. 8 at ¶ 23(A). The consulting agreement between Wright and VGI provides that, "[t]his agreement shall be governed by the law of the State of California without regard to choice-of-law provisions." VGI Opp. to T&T MSJ [dkt. #185], Ex. 2 at at 2-8, ¶ 7.01. Based on the plain language of these provisions, and because the parties do not contend that California and Illinois law differ, the court will use California law to interpret the DMA and when considering claims based on the consulting agreement.

This leaves numerous counterclaims which are outside the scope of the choice of law provisions. It appears that the choice of law issue only affects the result for VGI's eleventh counterclaim, which is based on California law. Thus, the court will apply Illinois law to the counterclaims that do not fall within the ambit of the choice of law provisions in the DMA and the consulting agreement, but will conduct a choice of law analysis when it reaches the eleventh counterclaim.

### C.    VGI's Counterclaims

VGI filed eleven counterclaims: (1) fraud in the inducement and conspiracy to commit fraud against all counterclaim defendants (Counterclaim I); (2) breach of contract against T&T based on the DMA (Counterclaim II); (3) breach of the implied covenant of good faith and fair

dealing against T&T based on the DMA (Counterclaim III); (4) breach of contract against Wright based on the consulting agreement (Counterclaim IV); (5) breach of the implied covenant of good faith and fair dealing against Wright based on the consulting agreement (Counterclaim V); (6) breach of fiduciary duty claim against Wright (Counterclaim VI); (7) breach of fiduciary duty against all counterclaim defendants (Counterclaim VII); (8) tortious interference with VGI's prospective economic advantage against all counterclaim defendants (Counterclaim VIII); (9) tortious interference with VGI's prospective economic advantage against all counterclaim defendants (Counterclaim IX); (10) trade libel against all counterclaim defendants (Counterclaim X); and (11) unfair business practices against all counterclaim defendants under the California Unfair Competition Law (Counterclaim XI).

The parties agree that the existence of damages is an essential element of each of the counterclaims. The T&T Parties thus contend they are entitled to summary judgment as to all of VGI's counterclaims because "VGI's claimed damages are speculative or otherwise not supported by admissible evidence." T&T MSJ on VGI's Counterclaims [dkt. #182] at 1. The court must, therefore, determine if VGI has met its burden of proof for damages for each of its counterclaims. Unfortunately, the parties focused on the general categories of damages identified by VGI, but did not attempt to link those damages with specific counterclaims. This left the court with the unenviable task of attempting to match up categories of damages with VGI's counterclaims.

The court begins by considering the T&T Parties' view of the counterclaims. The T&T Parties correctly note that VGI's amended counterclaims state that VGI has suffered damages in an amount to be proved at trial or in an amount not fully known, but not less than $3,500,000. Second, they point to VGI's response to Interrogatory No. 15 which asked VGI to "describe in

detail the damages [VGI] purportedly suffered as the result of the alleged conduct set forth in the amended counterclaim and provide a precise calculation of those damages." VGI's response identified ten various broad categories of damages and provided the requested calculation for one of the categories.[7] Third, they highlight the testimony of Keledjian and Capizzano, the only witnesses to testify about VGI's alleged damages. In response to direct questions about damages, Keledjian and Capizzano repeatedly stated that various categories of damages had not been or could not be quantified. *See, e.g.*, VGI Opp. to T&T MSJ [dkt. #185], Ex. 32 at 647:16-24; 648:13-20 ("I made some initial efforts to calculate what the stock value has been dropped based on certain actions, certain key dates of activities from your clients. In terms of the dollar lost on the deal that we took, we are in the process. We haven't got to it.")

### 1. VGI's Burden of Proof for Damages

Given the T&T Parties' arguments, VGI can survive summary judgment as to its counterclaims only if identifies evidence that would allow a reasonable jury to return a verdict in its favor. *See Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (the moving party carries the burden of showing that insufficient evidence supports the nonmoving party's case); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248 (when a movant sustains its initial burden of

---

[7] Specifically, VGI asserted that as a result of the T&T Parties' conduct it: (1) lost significant investment capital; (2) saw its stock price drop significantly; (3) built and financed the construction of a manufacturing facility it did not need; (4) expended at least $607,329.36 unnecessarily as a result of T&T's mismanagement of the Phase II Clinical Trial of VGV-1 in South Africa and T&T's breach of the DMA; (5) was forced to halt research and development that caused, among other things, a substantial delay in obtaining regulatory approval for VGV-1; (6) was forced to recreate the missing data ; (7) suffered the misappropriation of its confidential and proprietary business information; (8) suffered damage to its reputation and credibility; (9) was forced to accept death spiral financing arranged through HPC Capital; and (10) was forced to divert resources for its day-to-day business to litigation. Additionally, VGI stated that it incurred at least $3,500,000 in actual damages, plus costs, reasonable attorney's fees and punitive damages.

production, the nonmoving party must point to evidence upon which a jury could base a verdict in the nonmovant's favor).

As the counterclaimant, VGI bears the burden of establishing "a reasonable basis for computing damages." *See Snelson v. Kamm*, 204 Ill.2d 1, 34 (Ill. 2003) (internal quotations omitted); *see also Telemark Develop. Group Inc. v. Mengelt*, 313 F.3d 972, 983 (7th Cir. 2002). However, VGI need not prove the exact amount of its loss. *See Beasley v. Pelmore*, 259 Ill.App.3d 513, 523 (4th Dist. 1994). Instead, it must point to evidence that provides a basis to assess damages "with a fair degree of probability." *See id.*; *see also Kemper/Prime Indus. Partners v. Montgomery Watson Americas, Inc.*, 487 F.3d 1061, 1065 (7th Cir. 2007). VGI must also show that it suffered harm that is causally linked to the specific wrongful conduct alleged in each of its counterclaims. *See Siegel v. Shell Oil Co.*, 656 F.Supp. 2d 825, 834 (N.D. Ill. 2009).

For each counterclaim, the court will thus consider whether VGI has identified: (1) specific, allegedly wrongful conduct; (2) specific damages it seeks to recover based on that conduct; and (3) evidence sufficient for a trier of fact to find a causal link between the allegedly wrongful conduct and the claimed damages.

### 2. VGI's Counterclaims

#### a. Fraud & Conspiracy to Commit Fraud (Counterclaim I)

VGI contends that T&T Parties "entered into numerous agreements. . . to induce VGI to provide [the T&T Parties] with the authority and information necessary to develop VGV-1 . . .", that "[u]pon information and belief [the T&T Parties] did not intend to perform their obligations under these agreements" and that the T&T Parties made "false statements regarding their intent to perform such contracts." VGI and Keledjian's Amended Ans. to T&T's Amended

Counterclaims [dkt. #95] at 36, ¶¶ 169-172. It then asserts that this conduct caused it to incur more than $3,500,000 in damages.

Thus, the first counterclaim appears to seek relief based on a fraud in the inducement theory. VGI has not pointed to any specific allegedly false statements made by the T&T Parties prior to entering any of the contracts at issue in this case. Instead, VGI paints with a very broad brush and makes repeated, general assertions of fraud. This is insufficient. *See, e.g., Windy City Metal Fabricators & Supply, Inc. v. CIT Technology*, 536 F.3d 663, 668 (7th Cir. 2008).

Although it is not obligated to do so, the court culled VGI's responses to the T&T Parties' statement of facts [dkt. #186], and VGI's statement of additional facts [dkt. #186], in an attempt to locate misrepresentations by the T&T Parties that could support VGI's first counterclaim.[8] The only possible candidate is VGI's assertion that "[t]he T&T Parties devised a plan to put VGI in bankruptcy and pick up its assets – most notably patents relating to TNP – at a bankruptcy fire sale." VGI Resp. to T&T Facts and VGI Additional Facts [dkt. #186] at ¶ 5; VGI Opp. to T&T MSJ [dkt. #185]: Ex. 5-1 to 5-3; Ex. 6-1 to 6-6; Ex. 56; Ex. 39 at 461:3-454:11; Ex. 40 at 497:7-498:13 and 508:6-512:15; Ex. 41 at ¶¶ 17-20. In support, VGI cites to e-mails from Little and related testimony by Capizzano, Little and Wright. This evidence, however, postdates the agreements (the consulting agreement, Africa agreement, and DMA) and thus cannot support a claim of fraudulent inducement.

Moreover, it is impossible to tie VGI's alleged categories of damages to the allegations in the first counterclaim. VGI thus failed to carry its burden of tying the alleged wrongful conduct

---

[8] The court has no duty to sift through the mud of the record to find a gold coin. *United States v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003). To the extent that VGI may wish to take issue with the court's efforts to reach the merits of its claims by attempting to match up factual allegations with each of the counterclaims, it has forfeited any such arguments.

to VGI's claimed damages. Therefore, the T&T Parties are entitled to summary judgment as to VGI's first counterclaim.

### b.    Breach of Contract (Counterclaim II)

To prevail on a breach of contact action under California law, VGI must, among other things, establish that the breach caused it to incur damages. *See, e.g., Amelco Elec. v. City of Thousand Oaks*, 38 P.3d 1120, 1129 (Cal. 2002); *see also* Cal. Civ. Code § 3301-6 (2010) ("No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin").

In its second counterclaim, VGI appears to be asserting that it was harmed when T&T: (1) failed to reimburse VGI $35,881.65 for excess payments it made for TNP-001 and (2) refused to pay VGI $571,447.71, which represents half the cost of the TNP-002 trial. *See* VGI Resp. to T&T Facts and VGI Additional Facts [dkt. #186] at ¶¶ 40-44; T&T Facts in Supp. of SJ [dkt. #184], Ex. 16; Ex 13-1 to 13-5. The T&T Parties dispute that T&T was responsible for funding the TNP-002 trial. *Id* at ¶ 18. However, they do not dispute that if TNP-002 had been approved, they would have been responsible for half of the trial cost. *Id.*

Here, assuming the finder of fact adopted VGI's view of the record, it could also award damages to VGI (albeit potentially not $3,500,000 as requested) since VGI has provided an estimate of its damages, supporting documents, and an understandable link between the alleged conduct and resulting damages. This is especially true given that T&T has admitted it would be liable if it in fact was obligated to contribute to the cost of the TNP-002 trials. Thus, the T&T Parties are not entitled to summary judgment as to the second counterclaim.

### c. Breach of Implied Covenant of Good Faith & Fair Dealing Against T&T (Third Counterclaim)

VGI's third counterclaim, which seeks at least $3,500,000, is a claim against T&T for the breach of the implied covenant of good faith and fair dealing in the DMA. As discussed above, because this claim is based on the DMA, California law applies.

The California Supreme Court has held that, "it is well established that a covenant of good faith and fair dealing is implicit in every contract. The essence of the implied covenant is that neither party to a contract will do anything to injure the right of the other to receive the benefits of the contract." *Cates Construction, Inc. v. Talbot Partners*, 21 Cal.4th 28, 43 (1999). However, in California, recovery for a breach of the covenant of good faith and fair dealing is "limited to contract rather than tort remedies." *Id*. (internal citations and quotations omitted). The only exception to this rule is that "tort remedies are available for a breach of the covenant in cases involving insurance policies." *Id*. This is not an insurance case, so VGI's claim for breach of the covenant of good faith and fair dealing fails as a matter of law. Hence, summary judgment is granted as to this claim.

### d. Breach of Contract (Fourth Counterclaim)

The fourth counterclaim contains VGI's standard request for "an amount not yet fully known, but believed to exceed $3,500,000," VGI and Keledjian's Amended Ans. to T&T's Amended Counterclaims [dkt. #95] at ¶ 195, and is based on Wright's alleged breach of unspecified portion(s) of the consulting agreement. Yet again, VGI does not tie this counterclaim to any specific factual allegations.

The court has plucked out VGI's reference to the consulting agreement and Wright's obligation to advise it about potential financing and help it develop strategic partnerships as a

possible basis for this counterclaim. T&T Reply to VGI Additional Facts [dkt. #190] at ¶ 2; VGI Opp. to T&T MSJ [dkt. #185], Ex. 1; Ex. 2-2; Ex. 33; Ex. 32. According to VGI, instead of performing his duties so VGI could obtain financing, Wright set up T&T with Little in an effort to obtain distribution rights for Africa and used confidential information about VGI's profit margins for T&T's benefit. Thus, VGI appears to be claiming that Wright breached the consulting agreement by: (1) forming T&T and obtaining the distribution rights for VGV-1; and (2) using confidential information to benefit T&T.

According to Wright, as of 2006, the distribution rights to VGV-1 were worth between $12 to $14 million. T&T Reply to VGI Additional Facts [dkt. #190] at ¶ 4; VGI Opp. to T&T MSJ [dkt. #185], Ex. 1 at 44; Ex. 3:1-9; Ex. 4:1-6; Ex.39; Ex. 40; Ex. 41 ¶¶ 7-9. VGI does not appear to have disclosed in discovery that it was seeking damages based on the distribution rights. Instead, it mentioned the value of the distribution rights to support its claims regarding VGI's value as a company. *Id. at* ¶ 27; T&T Reply to VGI Additional Facts [dkt. #190], Ex. 3:1-9; Ex. 4:1-6; Ex. 39 at 507:8-513:22.

A party may not change theories after discovery has closed, so the value of the distribution rights cannot form the basis of a request for damages under a breach of contract theory. *See Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 549 (N.D. Cal. 2009) (rejecting the plaintiffs' attempt to "rely on the vague, very general damages allegations in [the] initial complaint to preserve their new, more extensive damages theories, even though they failed to disclose those theories in discovery for over two years, despite Defendants' efforts from the outset to flesh out Plaintiffs' sketchy damages allegations through appropriate discovery tools. To allow the belated disclosure of the new theories to trigger large new waves of expensive discovery and expert analysis at this late date based on vague allegations that Plaintiffs

previously refused to elaborate on despite their ability to do so, would be simultaneously unfair to Defendants, very expensive and hugely time consuming, slowing down what is already very lengthy litigation").

With respect to damages VGI seeks based on Wright's allegedly wrongful use of confidential information, VGI provides a helpful clue about the basis for its alleged damages by including the category "Misappropriation of Confidential Information." VGI Opp. to T&T MSJ [dkt. #185] at 14. In this section, VGI states, "[d]amages from the misappropriation amount to over $500,992.93," citing to additional fact 40 from VGI's statement of additional facts. *Id.* Additional fact 40 repeats the statement that damages flowing from the alleged misappropriation exceed $500,992.93 and clarifies that VGI paid this amount to settle with T&T when VGI found out that the T&T Parties had been in contact with its creditors. VGI Resp. to T&T Facts and VGI Additional Facts [dkt. #186] at ¶ 40; VGI Opp. to T&T MSJ [dkt. #185], Ex. 1 at ¶¶ 80-81; Ex. 32 at 666:23-667:24.

It also states it paid "more than it owed." *Id.* VGI thus appears to be admitting that a portion of the $500,992.93 was a legitimate debt owed to T&T. The alleged overpayment, by definition, must thus fall between 1¢ and $500,992.92. None of the evidence cited by VGI clarifies this issue. *See* VGI Opp. to T&T MSJ [dkt. #185], Ex. 1 at ¶¶ 80-81 & Ex. 32 at at 666:23-667:24. Kelejdian's only explanation regarding the alleged overpayment is that, "[i]f there had been no real threat of involuntary bankruptcy, which I learned about when a VGI creditor informed me that the T&T Parties contacted him with a plan to bankrupt VGI, I would not have paid so much more than VGI owed." Dkt. 185, Ex. 1 at ¶¶ 80-81. This is inadequate.

To the extent that VGI comments on the purported overpayment, it appears that VGI believes it overpaid a significant but unspecified amount. T&T Reply to VGI Additional Facts

[dkt. #190] at ¶ 40 ("If there had been no real threat of involuntary bankruptcy, VGI would not have paid so much more than VGI owed"); VGI Opp. to T&T MSJ [dkt. #185], Ex. 1 at ¶¶ 80-81; Ex. 32 at 666:23-667:24.  Thus, VGI has failed to carry its burden of pointing to evidence that a jury could use to determine the amount of the allegedly unnecessary payment.  *See e.g.*, *Acree v. Gen. Motors Acceptance Corp.*, 112 Cal. Rptr. 2d 99, 110 (Ct. App. 2001) (although the amount of damages need not be calculated with certainty, the record must support "some reasonable basis of computation"); *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 808-09 (9th Cir. 1988).

In any event, setting aside the computation problem, it appears that Zhabilov Jr. – not Wright – provided confidential information to T&T about VGI's creditors.  T&T Reply to VGI Additional Facts [dkt. #190] at¶ 40; VGI Opp. to T&T MSJ [dkt. #185], Ex. 1 at ¶¶ 80-81; Ex. 32 at 666:23-667:24.  To the extent that VGI is arguing that Wright provided confidential information, it does not specify what information is at issue or tie it to ascertainable damages. VGI has thus failed to establish causal links between Wright's conduct, the allegedly wrongful conduct that is at the heart of this counterclaim (using information about VGI's profit margins to benefit T&T when the DMA was negotiated in 2004), and some fraction of the $500,992.93 VGI allegedly overpaid in 2006.  Thus, the T&T Parties are entitled to summary judgment as to this counterclaim.

e.  **Breach of the Implied Covenant of Good Faith and Fair Dealing Against Wright (Fifth Counterclaim)**

VGI's fifth counterclaim is a claim for the breach of the implied covenant of good faith and fair dealing against Wright based on the consulting agreement.  VGI asserts that "[u]nder the Consulting Agreement, Wright owed to VGI an implied covenant of good faith and fair dealing.

Among other things, Wright was obligated to refrain from conduct that would result in injuring or infringing on VGI's right to receive the benefits of the Consulting Engagement. As a direct and proximate result of Wright's aforesaid breach of the covenant of fair dealing, VGI has been damaged in an amount to be proven at trial, but reasonably believed to exceed $3,500,00." VGI and Keledjian's Amended Ans. to T&T's Amended Counterclaims [dkt. #95] at ¶¶ 200-01.

The court has carefully reviewed VGI's filings in opposition to the motion for summary judgment. There is no discernable factual basis for this claim, as VGI has failed to identify specific conduct by Wright, let alone link this conduct to damages that could be established with reasonable certainty. Thus, VGI has not met its summary judgment burden and the T&T Parties' motion for summary judgment as to this counterclaim is granted.

### f. Breach of Fiduciary Duty (Sixth Counterclaim)

VGI's sixth counterclaim is a breach of fiduciary duty claim against Wright. Under Illinois law, to establish a breach of fiduciary duty, the movant must establish: (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damages proximately caused by the breach. *See e.g., Neade v. Portes*, 193 Ill.2d, 433, 444 (2000).

According to VGI:

[b]ased on his participation in the plan and conspiracy of Counterclaim defendants as set forth herein, and based on Wright's acts and omissions, and usurpation of VGI's corporate business opportunities, Wright breached his fiduciary obligations to VGI, causing harm to VGI as a direct result thereof. As a direct and proximate result of Wright's aforesaid breaches of his fiduciary duties to VGI, VGI has been damaged in an amount not yet fully known, but believed to exceed $3,500,000. The acts giving rise to Wright's breach of fiduciary duty were purposeful, willful, and wanton, and without regard to the rights of VGI. As a result, Wright is also liable to VGI for punitive and exemplary damages in an amount to be awarded at trial, but not less than $10 million.

VGI and Keledjian's Amended Ans. to T&T's Amended Counterclaims [dkt. #95] at ¶¶ 206-08.

Once again, the court begins by attempting to identify the allegedly wrongful conduct that forms the basis of this counterclaim, as VGI has failed to do so. A possible basis for this counterclaim is VGI's statement that, "[l]ater, Wright became a board member with fiduciary duties to VGI. However, instead of performing his duties and helping VGI obtain financing, Wright set up his own company with Little – T&T – to usurp VGI's corporate opportunity to sell distribution rights for Africa and used confidential information about VGI's profit margins for T&T's benefit." T&T Reply to VGI. Additional Facts [dkt. #190] at¶ 2; VGI Resp. to T&T Facts and VGI Additional Facts [dkt. #186] at ¶ 13. VGI's countercomplaint clarifies that Wright's fiduciary duty flows from his service on VGI's board of directors from September of 2003 to June of 2004. T&T Facts in Supp. of SJ [dkt. #184], Ex. 2 at ¶ 203.

VGI may only seek damages based on Wright's alleged breach of his fiduciary duties to VGI when those fiduciary duties existed. Therefore, VGI may not recover damages based on Wright's conduct after June of 2004. This means that VGI's contentions that Wright delayed the amendment of the endpoint in May of 2005 and failed to gather baseline data in June of 2005 are off the table. Damages based on the value of the distribution rights for VGV-1 are also unavailable because, as discussed above, they were not included in the categories of damages identified in discovery.

The court will not engage in further speculation as to precisely what Wright might have done to breach his fiduciary duties, what harm this might have caused, and how the conduct and alleged harm is linked. Thus, the T&T Parties' motion for summary judgment as to this counterclaim is granted.

### g. Aiding and Abetting Breach of Fiduciary Duty (Seventh Counterclaim)

VGI next contends that all of the defendants are liable for aiding and abetting a breach of fiduciary duty. To be liable for aiding and abetting a breach of fiduciary duty under Illinois law: "(1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Thornwood, Inc. v. Jenner & Block*, 344 Ill.App.3d 15, 27-28 (1st Dist. 2003) (internal citations and quotations omitted); *see also* Restatement (Second) of Torts § 876 (1979) (to recover under the theory of concert of action in Illinois, "one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person"). The aiding and abetting claim appears to be based on actions by T&T, Little, Wright, and Zhabilov Jr.

### i. T&T, Little, and Wright

First, VGI asserts that T&T and Little aided and abetted Wright in the breach of his fiduciary duty. As discussed above, however, the beach of fiduciary duty claim against Wright does not survive summary judgment. Thus, the aiding and abetting claim based on Wright's alleged breach of his fiduciary duties also must fall. *See Yates v. John Marshall Law School*, No. 08 C 4127, 2009 WL 1309516, at *7 (N.D. Ill. May 11, 2009) (aiding and abetting claim

cannot survive "without an underlying actionable tort that the defendant aided and abetted, resulting in his or her liability for that underlying tort") (internal quotations omitted).

### ii. T&T, Little, Wright, and Zhabilov Jr.

Second, VGI contends that T&T, Little and Wright aided and abetted Zhabilov Jr.'s breach of his fiduciary duty. Zhabilov Jr. was an officer and director of VGI. T&T Reply to VGI Additional Facts [dkt. #190] at ¶ 6; VGI Opp to T&T MSJ [dkt. #195], Ex. 39; Ex. 40; Ex. 38; Ex 7-1; Ex. 8-1; Ex. 10-1 to 10-2; Ex. 41. VGI asserts that Zhabilov Jr. breached his fiduciary duty by "misappropriating VGI's business, good will, trade secrets, business opportunities and intellectual property and by defrauding VGI in collusion with the other Counterclaim Defendants." VGI and Keledjian's Amended Ans. to T&T's Amended Counterclaims [dkt. #95] at ¶ 211.

As noted above, one of the elements of an aiding and abetting claim is that "the party whom the defendant aids must perform a wrongful act which causes an injury." *Thornwood, Inc. v. Jenner & Block*, 344 Ill.App.3d at 27-28. The court will thus focus on whether there is a triable issue of fact based on Zhabilov Jr.'s alleged breach of his fiduciary duty that could support an aiding and abetting claim.

While the court is not obligated to scour the record, it nevertheless reviewed VGI's Rule 56.1 submissions in an effort to locate facts that matched up with VGI's description of Zhabilov Jr.'s alleged breach of fiduciary duty. The fruits of this effort are a single reference that is supported with a citation referring to Zhabilov Jr.: ¶ 40 of VGI's statement of facts, which asserts that Zhabilov Jr. gave the T&T Parties information, including a list of VGI's creditors, to further their plan to bankrupt VGI. T&T Reply to VGI Additional Facts [dkt. #190] at ¶ 40

("Harry gave a list of creditors to Tim and Tom"); VGI Opp. to T&T MSJ [dkt. #186], Ex. 1 at ¶¶ 80-81; Ex. 32 at 666:23-667:24.

Setting aside the question of whether this conduct could support a claim for breach of fiduciary duty, the court turns to the now familiar exercise of attempting to identify damages allegedly flowing from this alleged breach of fiduciary duty. As noted above, VGI's response to the T&T Parties' statement of additional facts contains a section labeled "VGI Damages: VGI's Reputation and Prospects and Misappropriation of Confidential Information." T&T Reply to VGI Additional Facts [dkt. #190] at 45-48. The only mention of Zhabilov Jr. and the list of creditors states that he harmed VGI by sharing the list because it forced VGI to pay $500,992.93 allegedly owed to T&T. As discussed above with respect to the fourth counterclaim, the record does not contain any evidence from which a factfinder could approximate the amount of the alleged overpayment. Thus, VGI has failed to carry its burden of establishing damages based on this alleged breach by Zhabilov Jr.

VGI contends elsewhere that Zhabilov Jr. was obligated to determine the mechanism of drug action while employed at VGI and that he failed to do so because of the T&T Parties' interference. In support, it directs the court to a portion of Keledjian's deposition. T&T Reply to VGI Additional Facts [dkt. #190] at ¶ 28, 662:2-14; 663:2-666:22. The cited portions of Keledjian's deposition, however, do not refer to Zhabilov Jr. *See id.* Therefore, the T&T Parties cannot survive summary judgment based on this theory.

VGI may also be attempting to argue that Zhabilov Jr.'s conduct caused VGI to give up equity to the University of Colorado. The record, however, does not contain any details about the University of Colorado contract, such as when it was signed or what the terms were. It appears that the contract was executed at some point in the second half of 2006, but Keledjian

testified that as of mid-2006, VGI was no longer seeking to develop drug products derived from TNP. He further testified that this decision was made approximately 60 days before Zhabilov Jr. was terminated. T&T Reply to VGI Additional Facts [dkt. #190] at ¶ 28; VGI Opp. to T&T MSJ [dkt. #185], Ex. 1 at ¶¶ 10, 57, 58, 60, 68; Ex. 32 at 663:15-664:11, 662:2-14, 663:2-666:22l; Ex. 5 at 644:7-648:20. A trier of fact could only conclude VGI suffered ascertainable damages related to the University of Colorado deal as a result of Zhabilov Jr.'s breach of a fiduciary duty if it resorted to speculation and conjecture. Thus, this theory also fails to rescue VGI's seventh counterclaim.

Next, a search for the words "Zhabilov Jr." in VGI's Rule 56.1 filings unearthed VGI's contention that Zhabilov Jr. withheld information needed for registration in South Africa. T&T Reply to VGI Additional Facts [dkt. #190] at ¶ 29; VGI Opp. to T&T MSJ [dkt. #185], Ex. 1; Ex. 41; Ex. 32; Ex. 27-1 to 27-4; Ex. 41. Setting aside the question of whether this conduct could support a claim for aiding and abetting and whether T&T, Wright, or Little alleged aided and abetted Zhabilov Jr. in connection with this conduct, the record must contain evidence about damages caused by this conduct. VGI's Rule 56.1 submissions contain a section entitled "VGI's Damages: Delayed Regulatory Approval from Delayed Research & Development." T&T Reply to VGI Additional Facts [dkt. #190] at 35-42. In this section, VGI mentions Zhabilov Jr.'s alleged withholding of information, but then cites to general allegations about VGI's damages that have no discernable link to the conduct at issue.

Moreover, VGI does not point to evidence that could provide a jury with the means to calculate the amount of damages based on Zhabilov Jr.'s withholding of information. See *Kemper/Prime Indus. Partners*, 487 F.3d at 1065 (7th Cir. 2007) (noting that Illinois law requires the plaintiff's evidence to show a reasonable bias for the assessment of damages).

Indeed, VGI itself seems to be unable to quantify this amount.  *See e.g.,* T&T Facts in Supp. Of SJ [dkt. #184]"the cost [of Zhabilov Jr.'s delays] was significant – and difficult to estimate but significant"); VGI Opp. to T&T MSJ [dkt. #185], Ex. 27-4 ("I [Keldejian] can make several educated guesses about what the damages resulting from [Zhabilov Jr.'s actions] were, but let's just say we lost 18-24 months.  What is VRAL worth with an FDA-approved study under its belt?  With a Stanford University scientific publications [*sic*] published in peer-reviewed literature? Would we already be in partnership or talking to Big Pharma? Would we have NIH money?  You get the idea.  I don't know exactly, but I'm pretty sure we're farther ahead of where we are today").

Furthermore, if VGI is attempting to recover damages for its aiding and abetting claim based on lost opportunities, it has failed to point to admissible, non-speculative evidence, as discussed in connection with the T&T Parties' fourth objection, *supra*.

VGI also includes the drop in stock price in its list of alleged damages flowing from delayed research and development.  However, VGI links this damage exclusively to Wright's failure to amend the endpoint rather than any conduct linking Wright and Zhabilov Jr.  *See* VGI Opp. to T&T MSJ [dkt. #185] at 13; T&T Reply to VGI Additional Facts [dkt. #190] at ¶ 33 ("The late filing occasioned by Wright's failure to amend the endpoint led to VGI's inability to disclose the results as stated in the press release, which led to a drop in the stock price."); VGI Opp. to T&T MSJ [dkt. #185], Ex. 1 ¶¶ 67-68; Ex. 41 ¶ 37-44; Ex. 32 at 612:3-615:23, 657:13-666:5-22; Ex. 27-1 to 27-4.  Therefore, these alleged damages cannot support a claim for Wright's aiding and abetting Zhabilov Jr.'s breach of fiduciary duty.

Accordingly, VGI has failed to point to evidence sufficient to withstand summary judgment on its aiding and abetting breach of fiduciary duty counterclaim. Thus, the T&T Parties' motion for summary judgment is granted as to this counterclaim.

### h. Tortious Interference with Contractual Relationship (Eighth Counterclaim)

In its eighth counterclaim, VGI asserts that Wright, Little, and T&T tortiously interfered with its contractual relationship with Zhabilov Jr. To prevail on this claim, VGI must establish: (1) the existence of a valid and enforceable contract between it and Zhabilov Jr.; (2) the defendants' awareness of the contract; (3) the defendants' intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by Zhabilov Jr.; and (5) damages suffered by VGI as a result of the breach. *See Strosberg v. Brauvin Realty Servs., Inc.*, 295 Ill.App.3d 17, 32-33 (1st Dist. 1998). Damages for a tortious interference with contract claim consist of the "pecuniary loss resulting from the failure of the third person to perform the contract." *Fellhauer v. City of Geneva,* 142 Ill.2d 495, 513 (Ill. 1991), *citing* Restatement (Second) of Torts § 766 (1979).

VGI's tortious interference with contract counterclaim alleges that the T&T Parties "intentionally acted to induce Zhabilov Jr. to breach the Zhabilov Jr. Employment Agreement and/or to disrupt or interfere with the contractual relationship between VGI and Zhabilov Jr." VGI and Keledjian's Amended Ans. to T&T's Amended Counterclaims [dkt. #95] at ¶ 221, *see also* ¶ 218-223.[9] To survive summary judgment, VGI must direct the court to relevant,

---

[9] The logical starting point for consideration of this counterclaim is the Zhabilov Jr. Employment Agreement. Unaided by the parties, the court managed to locate the needle (the "Zhabilov Jr. Employment Agreement") in the haystack that is the summary judgment record. *See id.* at ¶¶ 95-101 (VGI's allegations about the "Zhabilov Jr. Employment Agreement"); *see also* T&T Resp. to VGI's Counterclaims [dkt. #102] (answer to counterclaims denying ¶¶ 95-

admissible evidence. Pleadings, such as VGI's tortious interference counterclaim, are insufficient. *See e.g., Keri v. Board of Trustees of Purdue University,* 458 F.3d 620, 651-52 (7th Cir. 2006) ("[a]t the summary judgment junction, the Plaintiff may not rely only on the bare assertions of his pleadings"). VGI has not demonstrated that there is a genuine issue of material fact with respect to each element of a claim for tortious interference with contract. Thus, the T&T Parties' motion for summary judgment as to this counterclaim is granted.

### i. Tortious Interference with Prospective Economic Advantage (Ninth Counterclaim)

VGI next generally contends that Wright, Little, and T&T tortiously interfered with VGI's prospective economic advantage. *See* VGI and Keledjian's Amended Ans. to T&T's Amended Counterclaims [dkt. #95] at ¶¶ 224-229). "It is generally recognized by the Illinois courts . . . that to prevail on a claim for tortious interference with a prospective economic advantage, a plaintiff must prove: (1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 511 (Ill. 1991) (collecting cases).

Thus, among other things, to survive summary judgment, VGI must point to evidence supporting damages that arise from the T&T Parties' alleged interference with a prospective business relationship between VGI and Zhabilov Jr. As discussed above in connection with the seventh counterclaim, VGI has failed to link any of Zhabilov Jr.'s actions purportedly resulting from the alleged influence of the T&T Parties to its categories of damages.

---

101 on various grounds).

-44-

Moreover, the allegedly wrongful actions taken by Zhabilov Jr. do not appear to be related to prospective business relationships between Zhabilov Jr. and VGI, as opposed to existing relationships. In any event, for the reasons discussed above, VGI has failed to carry its burden of pointing to evidence that supports its request for damages flowing from Zhabilov Jr.'s conduct. Thus, the T&T Parties' motion for summary judgment as to the ninth counterclaim is granted.

### j. Trade Libel (Tenth Counterclaim)

In its tenth counterclaim, VGI asserts that T&T, Wright, Little, and unknown others published or caused to be published false information about VGI and Keledjian on the internet and thus are liable for trade libel.[10] VGI does not clarify whether it seeks relief under a trade libel per se or, in the alternative, per quod theory. More fundamentally, its summary judgment memorandum does not identify what statements are at issue or present any arguments about why those statements create a triable issue of material fact. The court will not guess as to what statements are at issue and construct VGI's arguments for it. Given the age of this action and the ample opportunities VGI had to litigate this issue, the court finds that VGI has waived any arguments it might have based on a trade libel theory. The T&T Parties' motion for summary judgment as to this counterclaim is, therefore, granted.

---

[10] Setting aside concerns regarding the statute of limitations, the inclusion of claims against unknown counterclaim defendants does not affect jurisdiction in this diversity case, as even if the unknown parties are not diverse, the court could exercise supplemental jurisdiction over the claims against them. *See* 28 U.S.C. § 1367; *Rothman v. Emory University*, 123 F.3d 446, 454 (7th Cir. 1997).

### k.    Unfair Business Practices (Eleventh Counterclaim)

VGI's final counterclaim seeks relief under California's unfair competition statute, which makes any "unlawful, unfair or fraudulent business act or practice" actionable. *See* Cal. Bus. & Prof. Code § 17200. The basis for applying California law is unclear. *See Kamelgard v. Macura*, 585 F.3d 334, 340-41 (7th Cir. 2009) (discussing choice of law analysis and application of Illinois' "most significant relationship" test to determine what law applies).

In any event, even if California law did apply, California's unfair competition statute is subject to the heightened pleading requirements of Rule 9(b). *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). The Ninth Circuit has explained that:

> Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong. Averments of fraud must be accompanied by "the who, what, when, where, and how" of the misconduct charged.

*Id.* 1124-25 (internal citations and quotations omitted).

The eleventh counterclaim plainly fails to meet this standard as it provides, in full:

### ELEVENTH COUNTERCLAIM
#### (Unfair Business Practices Against All Counterclaim Defendants)

234.    Counterclaim Plaintiffs repeats and realleges each and every allegation of the Amended Counterclaims contained in Paragraphs 1 through 233 as if fully set forth herein.

235.    Under California law, unfair competition is any unlawful, unfair or fraudulent business act or practice. Cal. Bus. & Prof. Code § 17200, *et seq*.

236.    The acts and omissions of Counterclaim Defendants complained of herein constitutes unfair competition and violates California law.

237.    As a direct and proximate cause of Counterclaim Defendants' aforesaid unfair business practices, VGI has been damaged in an amount not yet fully known, but believed to exceed $3,500,000.

238.   VGI is also entitled to recover from the Counterclaim Defendants treble damages and attorneys' fees by statute.

VGI and Keledjian's Amended Ans. to T&T's Amended Counterclaims [dkt. #95] at ¶¶ 234-238.

These allegations clearly do not include "the who, what, when, where, and how" of the alleged fraud. *See Kearns v. Ford Motor Co.*, 567 F.3d at 1124-25. Indeed, they do not even include a bare bones summary of what specific conduct forms the basis of this counterclaim. The Ninth Circuit has noted that one of the purposes of Rule 9(b) is "to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Id.* 1125 (internal citations and quotations omitted). Given the age of this case and the lack of any motions to dismiss for failure to state a claim, it is fair to say that this goal has not been met, given that the eleventh counterclaim fails as a matter of law yet lingered on for four years. Be that as it may, to the extent that VGI can seek relief based on a California statute (an issue the court need not reach), the eleventh counterclaim would still be unavailing. Thus, the T&T Parties are entitled to summary judgment on the eleventh counterclaim.

## III.   Conclusion

For the above reasons, the T&T Parties' motion for summary judgment as to VGI's Counterclaims [dkt. #182], is granted in part and denied in part. Specifically, the motion is denied as to counterclaim two (breach of contract against T&T) and granted as to counterclaims one and three through eleven. The clerk is directed to correct the docket to reflect that VGI and Haig Keledjian are the only defendants in the main case, and T&T is the sole counter-defendant.

This case is set for status on August 17, 2010 at 11:00 a.m. At that time, the parties should be prepared to agree to firm trial and related dates.

DATE: August 10, 2010

Blanche M. Manning
United States District Judge